STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| In re: Application of Illuzzi – 138 Main Street | } | Docket No. 65-3-07 Vtec |
|  | } |  |

Decision and Order

Appellant Vincent Illuzzi appealed from a decision of the Development Review Board (DRB) of the City of Montpelier, denying approval of an enclosed entryway on the front porch or portico of the building at 138 Main Street. Appellant is an attorney and represents himself; the City is represented by Joseph S. McLean, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken prior to the hearing, with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Appellant proposes to construct a so-called airlock or enclosed entryway within the corner front porch or portico of the historic building at 138 Main Street. The entryway as a whole is intended to be in place only during the cold weather or winter heating season, from approximately October through April, to provide greater thermal efficiency for the building. The buildings is in use for offices so that the door is used approximately eighty times per day. There is a rear entrance to the building which includes an accessible ramp. Both entrances gain access to all the tenanted space in the building.

The building at 138 Main Street is sometimes known as the "Brock House." It was built in 1876 by banker and businessman James Brock and is recognized as an important example of the French Second Empire style. It was originally built as an imposing

1

residence and is an important contributing structure to the Montpelier Historic District. It is generally an elaborate and high-style brick building with a slate mansard roof, gabled dormer windows, a granite foundation, unusual metal window casings, and a corner entrance and tower. The imposing entrance is built into the front left[1] corner of the building, under the tower. The entrance portico is an integral part of the front corner of the building, as opposed to extending outward from the front of the building like some of the other covered porches or entryways on other historic residential buildings along Main Street.

The front entrance to the building is reached by a set of granite slab steps, flanked by carved granite side-pieces, leading up to the granite slab floor of the porch or portico protecting the front entrance of the building. Iron railings have been installed on both sides of the stairway, attached to the granite on the bottom step (where they are rusting) and on the porch slab.

The front entrance to the building consists of a ten-foot-tall arched double-leaf paneled and elaborately carved wooden entrance door, within a narrow black door frame and a brick archway supported by brick corbels. The tower is supported by archways at the front and the side of the porch, matching the arch of the doorway, so that the entire doorway may be seen from the street. The porch roof is supported at its front left corner by an elaborate cast iron Corinthian column, echoed by elaborate cast iron pilasters at the left rear corner and the right front corner. The columns, plinths, pilasters and archways are painted a dark green, with the plinth paneling, capitals and other decorative elements picked out in gold. The cast iron material of the column and pilasters has been damaged over time by the action of salt used in the winter to keep the front path and entrance steps clear of ice, and has required expensive repairs. The lower portion of the wooden door

---

[1] All directional words are used as if the viewer were facing the building.

panels has also been damaged by moisture and requires maintenance, if not repair.  The mailboxes for the building are located along the right-hand wall of the building within the portico.

The oversized front door provides access directly into the hall and stairwell of the historic building.  There is no room to create an enclosure or so-called airlock entry inside the building between the front door and the stairway.  There is some evidence of molding markings on the wood ceiling of the porch indicating that some sort of enclosure had been installed within the portico in the past.  An historic but electrified lantern is suspended from the wood ceiling of the porch; no evidence was presented with regard to when the installation of electricity was made.

The proposal involves[2] affixing two vertical bronze-colored aluminum channels to the brick walls of the building.  One is proposed to be placed on the rear wall of the portico, to the right of the rear pilaster, up over the brick corbel[3] to the left of the heavy decorative wood doors to the building.  The other is proposed to be placed on the side wall of the portico, next to the side pilaster.  Both of these aluminum channels are proposed to be fastened into the mortar between the bricks; this method of fastening would be reversible and not create any permanent damage to the historic building.  The channels would also be fastened to the wooden ceiling inside the portico; this fastening would not be visible from the exterior, and also would not cause permanent damage to the building.  These two channels are proposed to be left on the building year round, to avoid damage to the mortar by their annual removal and replacement.

---

[2]  No formal application was provided in evidence; the description of the proposal is taken from the three-page sketch of the proposal and the witnesses' testimony.

[3]  No testimony explained exactly whether the channel would be installed only below the corbel and above the arch, or otherwise how it would run over the corbel and arch, or whether the plexiglass material was proposed to be cut out around the profile of the corbel.

3

The proposal also requires a vertical aluminum post to be installed near the inside corner of the column; this post would also be left on the building year round. The post is proposed to be fastened into the granite slab by drilling holes into the granite slab as well as being fastened with screws into the ceiling of the portico. The holes in the granite slab for the post would be new permanent holes in the granite slab. Applicant did not present technical evidence from which the Court could determine whether it is or is not technically feasible to fill such holes at a later date so that they would be visually and functionally similar to the intact granite; that is, so that the granite would not be susceptible to further damage after the removal of the fasteners.

Channels along the granite floor slab are not proposed to be fastened into the granite. However, additional holes are proposed to be drilled into the granite slab to support the entryway door. Again, technical evidence was not presented from which the Court could determine whether it is or is not technically feasible for such holes to be drilled into the granite slab in such a way as to avoid damage to the granite slab from water freezing and expanding in the holes, or from the use of the door.

The entryway is proposed to be constructed with two additional friction-fitted vertical channels on the side of the entryway, and vertical channels on the front of the entryway continuing above the door frame, to hold lightweight clear plexiglass panels in place, behind the portico's columns, pilasters and arches. The very light design elements of the plexiglass panels and thin aluminum channels are intended to make the entryway enclosure unobtrusive, that is, to minimize its visual effect. However, the overall effect of the large expanse of plexiglass and narrow metal supports will be to give the entry the appearance of a modern and obtrusive reflective surface as contrasted with its elaborate decorative surroundings.

Permanent airlock-type entrances using metal framing and glass panels are installed on non-residential buildings on Main Street: on a church building across Main Street from

Appellant's building, and on a restaurant building and a bank building on the same side of Main Street as Appellant's building, in the block of commercial buildings approaching State Street. In addition, evidence was presented regarding the Vermont Mutual Insurance Company building on State Street, which is a Federal style building with a curved fanlight over the central entrance at the front of the building. A temporary free standing airlock structure is in seasonal use in front of the front entrance; it is constructed of painted wood members with glass windows, and appears to be surmounted by a curved awning fabric top and plastic window matching the curve of the fanlight.

The City first argues that the application before the Court was not complete and should be denied on that basis. The application consisted of three pages of hand-drawn conceptual sketches rather than all the materials required by §§ 302 and 305.E of the Zoning and Subdivision Regulations ("Regulations"). While these deficiencies might have supported a determination at the municipal level that the application was not complete, such a determination was not made and the application was allowed to proceed. Nor did the City request remand of the application for further proceedings at the municipal level on that basis. At this time it would not be an efficient use of the Applicant's, the City's, or the Court's resources to decline to reach the merits of the proposal as presented to the Court.

Although Appellant has argued the energy conservation benefits of the proposed entrance enclosure, the parties have not drawn the Court's attention to any provision of the City's Zoning and Subdivision Regulations that would allow the DRB (and hence this Court) to consider or weigh any energy conservation benefits (or detriments, for that matter) in conducting the design review or zoning approval process for this application. Similarly, the parties have not drawn the Court's attention to any waiver provision or other special treatment of energy conservation measures, as contrasted with provisions in the

5

ordinance, for example, allowing unenclosed wheelchair access ramps on residential buildings even though they must be placed within required setbacks. Regulations, § 605(D)(7).

The evidence reflected that the building's rear access provides access to all of the tenant units within the building. Several witnesses suggested that an enclosed entrance should instead be designed for the rear of the building, as a less obtrusive alternative than the enclosure of the front of the building. Certainly, the Design Review Committee may recommend "design modifications" to "further the intents and purposes of the design control provisions of the ordinance," Regulations, § 305.C.5. The Development Review Board (and hence this Court) may impose conditions, and "may incorporate the Design Review Committee's recommendations into its decision." Regulations, § 305.C.8. However, no such proposal or recommendation is before the Court in this application, and parties have not drawn the Court's attention to any provision in the ordinance requiring a landowner to propose or use the least obtrusive alternative.

Rather, the Court is directed by statute to apply the substantive standards that were applicable before the DRB, as the tribunal appealed from. V.R.E.C.P. 5(g); 10 V.S.A. §8504(h). Those standards are found in § 305.F of the ordinance. Appellant is correct that those standards do not require a needs-based analysis, do not require the consideration of alternatives to the proposal, and do not incorporate by reference the federal guidelines published by the U.S. Secretary of the Interior.

Applying solely the standards in the City's Zoning and Subdivision Regulations, the present proposal for enclosure of the building's entrance portico fails to meet subsections 1, 3, and 5 of § 305.F.

While the intended design purpose of the very light design elements of the plexiglass panels and thin aluminum channels was to make the entryway enclosure relatively unobtrusive, the use of those materials and light design elements does not carry

6

out and therefore preserve the appropriate historic style of the building. The design is visually incompatible with the heavier and more ornate decorative elements of the building's columns, doorway and brickwork, and actually has the effect of making the enclosure more visually obtrusive because it is so modern, stark and reflective. The plexiglass-and-aluminum enclosure is not in harmony or compatible with the appropriate historic style and exterior materials of the building itself, nor are the materials compatible with those used in the other formerly residential historic buildings along Main Street.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the three-page sketch application that is the subject of the present appeal[4] is DENIED. This denial specifically does not preclude Applicant's future submission of revised or other proposals or designs for enclosures or other weatherproofing at either the front or the rear entrance to the building. If any such submission is made, it will be for the DRB in the first instance to determine whether any particular proposal is sufficiently different from the present proposal to be considered on its merits. 24 V.S.A. § 4470(a).

Dated at Berlin, Vermont, this 4th day of February, 2008.

_____
Merideth Wright
Environmental Judge

---

[4] This decision does not address whether or not an enclosure designed to use any of the other design elements discussed by the witnesses at trial (such as metal or wood columnar supports, or wood panels, or glass window panels) would or would not meet the criteria; any such consideration would be for the DRB in the first instance.